### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA
*ex rel.* MICHAEL O'CONNOR and
CELIA RUMANN,

      Plaintiffs,

v.

ARIZONA SUMMIT LAW SCHOOL,
LLC, FLORIDA COASTAL SCHOOL OF
LAW, INC., CHARLOTTE SCHOOL OF
LAW, LLC, INFILAW CORPORATION,
INFILAW HOLDING, LLC, STERLING
CAPITAL PARTNERS, BARBRI, INC.,
and KAPLAN, INC.

      Defendants.

Case No. 3:15-CV-1351-J-39JBT

**FILED IN CAMERA AND
UNDER SEAL**

JURY TRIAL DEMANDED

### COMPLAINT

On behalf of the United States of America and themselves, Relators Michael

O'Connor and Celia Rumann ("Relators") file this *qui tam* complaint against

Arizona Summit Law School, LLC, Florida Coastal School of Law, Inc., Charlotte

School of Law, InfiLaw Corporation, InfiLaw Holdings, LLC, Sterling Capital

Partners, BarBri, Inc., and Kaplan, Inc. ("Defendants"), and allege as follows:

### INTRODUCTION

This is a civil action to recover damages and penalties on behalf of the United

States of America arising from false claims and statements made, caused and/or

S-4

presented by the Defendants in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

The FCA allows an individual known as the relator, or whistleblower, to file an action on behalf of the government for violations of the FCA and receive a portion of any recovery as an award to the *qui tam* plaintiff. 31 U.S.C. § 3730. Under the FCA, the Complaint must be filed under seal (without service on the defendants) to enable the government to conduct its own investigation without the defendants' knowledge and to allow the government an opportunity to intervene in the action.

Defendants have violated the FCA by engaging in a scheme to submit, or cause to be submitted, false claims for student loans from the federal student aid programs administered by the U.S. Department of Education (ED). Specifically, Defendants knowingly engaged in a scheme to falsify three for-profit law schools' compliance with the regulations governing the schools' eligibility to participate in the federally-subsidized student loan programs created under Title IV of the Higher Education Act, 20 U.S.C. §§ 1070 et seq. ("Title IV"). Defendants' misconduct has resulted in millions of dollars in false claims that were submitted to and paid by the federal government.

## JURISDICTION AND VENUE

1.      Relators bring this action on behalf of themselves and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

2

This Court has subject matter jurisdiction over Plaintiffs' claims arising under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. § 1331 and 1345. The Court has supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or have transacted business within the United States.

Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because at least one Defendant resides in this district and because alleged violations of the FCA occurred in this district.

## DEFENDANTS

Defendant Arizona Summit Law School, LLC, formerly known as Phoenix School of Law, operates a for-profit law school located in Phoenix, Arizona ("Summit Law"). Summit Law is registered as a Delaware limited liability company. Prior to November 2013, Summit Law was named the Phoenix School of Law.

Defendant Florida Coastal School of Law, Inc. operates a for-profit law school located in Jacksonville, Florida ("Florida Coastal"). Florida Coastal is registered as a Delaware Corporation.

Defendant Charlotte School of Law, LLC operates a for-profit law school located in Charlotte, North Carolina ("Charlotte Law"). Charlotte Law is registered as a Delaware limited liability company.

3

Defendants Summit Law, Florida Coastal and Charlotte Law are all owned by Defendant InfiLaw, a for-profit consortium of law schools, and collectively referred to herein as the "InfiLaw Schools."

Defendant InfiLaw Corporation is a Delaware corporation with its primary place of business located at 8625 Tamiami Trail North, Suite 500, Naples, Florida 34108. Defendant InfiLaw Holdings, LLC is a Delaware limited liability company with its primary place of business in Naples, Florida. The Defendants in this paragraph are collectively referred to herein as "InfiLaw."

InfiLaw owns, operates and manages the InfiLaw Schools. InfiLaw dictates or approves all major management decisions, policies, and business arrangements at the InfiLaw Schools.

Defendant Sterling Capital Partners, LLC, d/b/a Sterling Partners, is a Chicago-based private equity firm that is registered as a Delaware limited liability company ("Sterling Partners"). Sterling Partners purchased Florida Coastal School of Law in 2004 and formed InfiLaw as a holding and management company for Florida Coastal. Sterling continues to hold an approximate 88% interest in InfiLaw and directly controls the management and policy decisions made by InfiLaw and the InfiLaw Schools.

Defendant Barbri, Inc. is a Delaware corporation with its primary place of business located at 9400 North Central Expressway, Ste. 613, Dallas, Texas 75231 ("Barbri"). Barbri provides preparation courses and materials for individuals taking state bar exams, most of whom are recent law school graduates.

4

Defendant Kaplan, Inc. is a Delaware corporation with its primary place of business located Fort Lauderdale, Florida ("Kaplan"). Kaplan provides preparation courses and materials for individuals taking state bar exams and is a competitor with Barbri in the bar exam preparation course market.

## THE RELATORS

Relator Michael O'Connor was formerly employed by the Summit Law as an Associate Professor of Law with tenure.

Relator Celia Rumann was formerly employed by the Summit Law as an Associate Professor of Law with tenure.

As defined in 31 U.S.C. § 3730(e)(4)(B), Relators qualify as the "original source" of the allegations made herein. Specifically, the violations alleged herein are based upon Relators' personal knowledge, expertise in the legal education field, and non-public information obtained by Relators during and after their employment at Summit Law. Relators provided the information that forms the basis of the allegations made herein to the federal government prior to the filing of this Complaint and prior to any public disclosure of the violations alleged herein.

## THE GOVERNMENT PROGRAMS

### A.    Title IV of the Higher Education Act

Under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 et seq., Congress established various student loan and grant programs, including but not limited to the Federal Family Education Loan Program ("FFELP"), and the Federal

Direct Loan Program ("FDLP") (collectively "Title IV programs") in order to financially assist eligible students in obtaining a post-secondary education.

Although the mechanism by which funding is disbursed to eligible students under the Title IV programs varies, each Title IV program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

In order to become eligible to receive Title IV funding under programs such as FFELP or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a program participation agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. §668.14.

Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. §§ 668.14 and 668.22.

In addition to the requirements set forth by statute or regulation, the ED publishes annually the Federal Student Aid Handbook (referred to herein as the "FSA Handbook"), which provides additional guidance for institutions that participate in Title IV programs. Each time an institution submits data or requests or disburses funding from a Title IV funding source, it is implicitly and explicitly representing that the data, request, or disbursement is compliant with the instructions set forth in the FSA Handbook.

### B.   Title IV Loan Programs

Under the FFELP loan programs, which include subsidized and un-

6

subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States for many loans prior to July 2010. No new loans were made under FFELP after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student. If a student defaults in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the lender or the subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. 34 C.F.R. § 682.401(b)(14). If the guaranty agency is unable to collect from the borrower, the ED reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, 20 U.S.C. § 1078(c)(1)(A), and the ED may, in its discretion, take assignment of the loan. 20 U.S.C. § 1078(c)(8). In this way, the government is ultimately called upon to satisfy claims for payment.

In order to participate in the FFELP or any other Title IV loan, as opposed to grant, program, a student completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. The institution, in turn, completes a "School Certification," in which it certifies the accuracy of the information it provided to the ED and the student's eligibility for the loan. 34 C.F.R. § 682.102. While the MPN itself is valid for ten years, the educational institution determines the student's ongoing eligibility for aid and completes the School Certification annually.

Under FFELP, the educational institution then submits the MPN to the lender. Upon approval by the lender, the lender obtains a loan guarantee from a

7

guarantee agency. 34 C.F.R. § 682.102. The loan is made in reliance upon the accuracy of the information provided by the educational institution.

The lender transfers the FFELP funds directly into the educational institution's account. Upon receiving the FFELP funds, the educational institution credits a student's account for education-related expenses, such as tuition, fees, books, and supplies.

For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

In the event that a student defaults on his or her loan, the ED pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

After July 2010, the Direct Loan program replaced the FFELP program as the primary source of Title IV student loans. Under the direct loan program, the federal government directly provides eligible students with subsidized and unsubsidized Stafford loans. Again, these loans disbursements are made directly to an institution, and the institution is responsible for disbursing or "drawing down" funding for tuition and related education expenses. Once tuition and other expenses owned to the school have been paid, students may be eligible to receive disbursements of their remaining eligible funds to cover living expenses and other indirect education costs.

8

Federal Direct Loans are available to students who meet eligibility requirements including being matriculated into a degree program, enrolling at least half time, and meeting Satisfactory Academic Progress requirements.

Title IV grant and loan funding is only available if both the student and school meet the eligibility requirements set forth in Title IV statute, regulations promulgated under Title IV, and other guidance issued by the Department of Education.

The loans made by the United States through the Title IV programs are subsidized United States taxpayers in that the government pays a portion of the interest on the loans and covers the cost of loan defaults and student loan forgiveness programs for which many students are or will be eligible.

C.      The 90/10 Rule

For-profit or proprietary institutions, such as the InfiLaw Schools, must derive at least 10 percent of their revenues for each fiscal year from sources other than Title IV, HEA program funds. 34 C.F.R. § 668.28. This is referred to as the "90/10 Rule."

Compliance with the 90/10 Rule is a requirement for institutions to continue participation in Title IV Student Aid Programs. 34 C.F.R. § 668.14(b)(16).

The methodology for calculating the percentage of a school's revenue that is derived from Title IV sources is set forth in 34 C.F.R. § 668.28. "90/10 Revenue" is defined as funds generated from:

(i)   Tuition, fees, and other institutional charges for students enrolled in eligible programs as defined in §668.8;

(ii)  Activities conducted by the institution that are necessary for the education and training of its students provided those activities are—

(A) Conducted on campus or at a facility under the institution's control;

(B) Performed under the supervision of a member of the institution's faculty; and

(C) Required to be performed by all students in a specific educational program at the institution; and

(iii) Funds paid by a student, or on behalf of a student by a party other than the institution, for an education or training program that is not eligible under §668.8 if the program—

(A) Is approved or licensed by the appropriate State agency;

(B) Is accredited by an accrediting agency recognized by the Secretary under 34 CFR part 602;

(C) Provides an industry-recognized credential or certification, or prepares students to take an examination for an industry-recognized credential or certification issued by an independent third party;

(D) Provides training needed for students to maintain State licensing requirements; or

(E) Provides training needed for students to meet additional licensing requirements for specialized training for practitioners that already meet the general licensing requirements in that field.

34 C.F.R. § 668.28(a)(3).

Revenue does not include "[t]he amount the student is charged for books,

supplies, and equipment unless the institution includes that amount as tuition, fees, or other institutional charges." 34 C.F.R. § 668.28(a)(7)(v).

Every proprietary institution must report the percentage of revenue it receives from Title IV sources on an annual basis. This ratio is reported in a footnote to the schools' financial statement audit, which is submitted to the ED. The revenue percentage must be calculated in accordance with 34 C.F.R §668.28. The institution must also report in the footnote the dollar amount of the numerator and denominator of its 90/10 ratio as well as the individual revenue amounts identified in section 2 of appendix C to subpart B of part 668. 34 C.F.R. § 668.28.

If an institution does not derive at least 10 percent of its revenue from sources other than Title IV, HEA program funds:

(1)     For two consecutive fiscal years, it loses its eligibility to participate in the Title IV, HEA programs for at least two fiscal years. To regain eligibility, the institution must demonstrate that it complied with the State licensure and accreditation requirements under 34 CFR 600.5(a)(4) and (a)(6), and the financial responsibility requirements under subpart L of this part, for a minimum of two fiscal years after the fiscal year it became ineligible; or

(2)     For any fiscal year, it becomes provisionally certified under §668.13(c)(1)(ii) for the two fiscal years after the fiscal year it failed to satisfy the revenue requirement. However, the institution's provisional certification terminates on—

(i) The expiration date of the institution's program participation agreement that was in effect on the date the Secretary determined the institution failed this requirement; or

(ii) The date the institution loses its eligibility to participate under paragraph (c)(1) of this section; and

11

(3)     It must notify the Secretary no later than 45 days after the end
of its fiscal year that it failed to meet this requirement.

34 C.F.R. § 668.28(c).

### D.     Federal Proprietary Institution Requirements

To be considered an eligible program, a proprietary institution must meet the

requirements set forth in 34 C.F.R. § 668.8, which covers programs that prepare

students for gainful employment in a recognized occupation. 34 C.F.R. § 600.5(a)(5).

It is also required that the school be accredited by an accrediting agency recognized

by the U.S. Secretary of Education. 34 C.F.R. § 600.5(a)(6).

As proprietary institutions, the InfiLaw Schools are also required to report

the employment status of their graduates. 34 C.F.R. §668.6 states, in relevant part,

that the institutions must disclose to prospective students:

> (iv) The placement rate for students completing the program, as determined
> under a methodology developed by the National Center for Education
> Statistics (NCES) when that rate is available. In the meantime, beginning on
> July 1, 2011, if the institution is required by its accrediting agency or State to
> calculate a placement rate on a program basis, it must disclose the rate under
> this section and identify the accrediting agency or State agency under whose
> requirements the rate was calculated. If the accrediting agency or State
> requires an institution to calculate a placement rate at the institutional level
> or other than a program basis, the institution must use the accrediting
> agency or State methodology to calculate a placement rate for the program
> and disclose that rate;

34 C.F.R. §668.6(b)(iv).

### E.     Accrediting Agency Requirements

In order to be eligible to participate in the Title IV programs, an institution

must be accredited by an accreditation agency recognized by the United States

Secretary of Education. 34 C.F.R. § 600.5. Loss of accreditation results in an automatic 24-month loss of the institution's Title IV eligibility. 34 C.F.R. § 600.11(c).

The InfiLaw Schools' accrediting agency is the American Bar Association ("ABA").

### i.   ABA Required Disclosures

ABA Standard 509 requires that:

> (a) All information that a law school reports, publicizes, or distributes shall be complete, accurate and not misleading to a reasonable law school student or applicant. A law school shall use due diligence in obtaining and verifying such information. Violations of these obligations may result in sanctions under Rule 16 of the Rules of Procedure for Approval of Law Schools.
>
> (b) A law school shall publicly disclose on its website, in the form and manner and for the time frame designated by the Council, the following information: (1) admissions data; (2) tuition and fees, living costs, and financial aid; (3) conditional scholarships; (4) enrollment data, including academic, transfer, and other attrition; (5) numbers of full-time and part-time faculty, professional librarians, and administrators; (6) class sizes for first-year and upper-class courses; number of seminar, clinical and co-curricular offerings; (7) employment outcomes; and (8) bar passage data.

The information that its member law schools are required to report under Standard 509 is material to the schools' ABA accreditation and, hence, material to the schools' eligibility to participate in the Title IV programs.

### ii.   ABA Bar Passage Requirements

13

ABA Standard 316 sets out the minimum state bar exam passage rates that a schools' graduate must achieve in order for the school to remain accredited by the ABA. Standard 316 states that:

> A.   A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:
>
> 1) That for students who graduated from the law school within the five most recently completed calendar years:
>
> > (a) 75 percent or more of these graduates who sat for the bar passed a bar examination, or
> >
> > (b) in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination. In demonstrating compliance under sections (1)(a) and (b), the school must report bar passage results from as many jurisdictions as necessary to account for at least 70% of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.
>
> 2) That in three or more of the five most recently completed calendar years, the school's annual first time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions. In demonstrating compliance under section (2), the school must report first-time bar passage data from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency. When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to determine compliance.
>
> B.   A school shall be out of compliance with the bar passage portion of 301(a) if it is unable to demonstrate that it meets the

14

requirements of paragraph A (1) or (2).

C.    A school found out of compliance under paragraph B and that has not been able to come into compliance within the two year period specified in Rule 13(b) of the Rules of Procedure for Approval of Law 21 ABA Standards for Approval of Law Schools 2013-2014 Schools, may seek to demonstrate good cause for extending the period the school has to demonstrate compliance by submitting evidence of:

(i)    The school's trend in bar passage rates for both first-time and subsequent takers: a clear trend of improvement will be considered in the school's favor, a declining or flat trend against it.

(ii)    The length of time the school's bar passage rates have been below the first-time and ultimate rates established in paragraph A: a shorter time period will be considered in the school's favor, a longer period against it.

(iii)    Actions by the school to address bar passage, particularly the school's academic rigor and the demonstrated value and effectiveness of the school's academic support and bar preparation programs: value-added, effective, sustained and pervasive actions to address bar passage problems will be considered in the school's favor; ineffective or only marginally effective programs or limited action by the school against it.

(iv)    Efforts by the school to facilitate bar passage for its graduates who did not pass the bar on prior attempts: effective and sustained efforts by the school will be considered in the school's favor; ineffective or limited efforts by the school against it.

(v)    Efforts by the school to provide broader access to legal education while maintaining academic rigor: sustained meaningful efforts will be viewed in the school's favor; intermittent or limited efforts against it.

(vi)    The demonstrated likelihood that the school's students who transfer to other ABA-approved schools will pass the bar examination: transfers by students with a strong likelihood of passing the bar will be considered in the school's

favor, providing the school has undertaken counseling and other appropriate efforts to retain its well-performing students.

(vii)   Temporary circumstances beyond the control of the school, but which the school is addressing: for example, a natural disaster that disrupts the school's operations or a significant increase in the standard for passing the relevant bar examination(s).

(viii)   Other   factors,   consistent   with   a   school's demonstrated and sustained mission, which the school considers relevant in explaining its deficient bar passage results and in explaining the school's efforts to improve them.

### ii.   Admission of Qualified Students

ABA Standard 501 (b) states: "[a] law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar." Importantly, Interpretation 501-4 states:

A   law   school   may   not   permit   financial   considerations detrimentally to affect its admission and retention policies and their administration. A law school may face a conflict of interest whenever the exercise of sound judgment in the application of admission policies or academic standards and retention policies might reduce enrollment below the level necessary to support the program.

### F.   Title IV Reporting and Certification Requirements

In order to maintain its eligibility to receive Title IV funding, a for-profit educational institution that participates in any Title IV program must provide the ED with an annual compliance audit of its administration of Title IV programs, and an audit of the institution's financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23 (a)(2) & (a)(4). For-profit educational institutions, such as the InfiLaw Schools, must conduct their annual financial

statements and compliance audits in accordance with the ED Office of Inspector General's Audit Guide. The ED uses the results of the compliance and financial audits to determine whether schools are adhering to applicable requirements for Title IV funding, including the 90/10 requirement. As part of the annual audits, the InfiLaw Schools were required to certify, in the form of written "Required Management Assertions," that, among other things, it complies with the requirements for eligibility to participate in Title IV programs.

After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under FDLP, for example, students submit requests for funding directly to the ED, or to the ED with the assistance of schools. Under the FFELP, students and schools jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the ED and paid in the event of a default.

With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered. A student cannot be eligible to receive Title IV funding unless he or she is enrolled in a school that is ineligible to receive Title IV funding.

34 C.F.R. § 600.40 sets forth the criteria, process and consequences for an institution's loss of Title IV eligibility. An education institution loses eligibility to participate in Title IV programs on the date that the institution fails to meet any of the eligibility requirements set forth in Part 600 of Title 34 of the Code of Federal

Regulations. 34 C.F.R. § 600.40 (a)(1). An institution must notify the Secretary (ED) within 30 days of the date that it ceases to satisfy a requirement for eligibility.

By entering into a Program Participation Agreement with the ED, each of the InfiLaw Schools agreed to act as a fiduciary. 34 C.F.R. § 668.82. Specifically, "A participating institution or a third-party servicer that contracts with that institution acts in the nature of a fiduciary in the administration of the Title IV, HEA programs. To participate in any Title IV, HEA program, the institution or servicer must at all times act with the competency and integrity necessary to qualify as a fiduciary." 34 C.F.R. § 668.82(a). "A participating institution is subject to the highest standard of care and diligence in administering the programs and in accounting to the Secretary for the funds received under those programs." 34 C.F.R. § 668.82(b)(1).

The Program Participation Agreements that were agreed to by the InfiLaw Schools required the schools to certify that, among other things, the schools would comply with the program statutes, regulations, and policies governing the federal student aid programs.

The InfiLaw Schools also explicitly certified in their program participation agreements that they would comply with Title VI of the Civil Rights Act of 1964, as amended, and Title IX of the Education Amendments of 1972. These federal statutes prohibit discrimination on the basis of race, color, national origin, or sex.

Each time a Title IV institution disburses or "draws down" Title IV funding, it must certify its compliance with Title IV regulations.

18

Both the Title IV regulations and ABA Standards prohibit the InfiLaw Schools from publishing any false or misleading information regarding their programs.

## DEFENDANTS' MISCONDUCT

The InfiLaw Schools, under the direction and control of InfiLaw and Sterling Partners, submitted or caused to be submitted false claims for Title IV funding and false statements that were material to the federal student aid funds that were disbursed to, or on behalf of, the InfiLaw Schools' students.

The InfiLaw Schools, with the assistance of the other Defendants, have violated the False Claims Act by creating programs and schemes that were designed to manipulate and falsify the information that the InfiLaw Schools are required to report to the ABA, ED, and prospective and current students.

The false information submitted by the InfiLaw Schools includes false 90/10 Rule data, bar passage rates, and graduate employment data.

These false statements were knowing and material to the InfiLaw Schools' eligibility to participate in Title IV programs.

In addition to the factually false claims and material statements made by the InfiLaw Schools, the InfiLaw Schools also expressly and impliedly certified that they were in compliance with the conditions set forth in their Program Participation Agreements, the federal regulations governing the Title IV program, and the accreditation standards promulgated by the ABA. These certifications were knowingly false.

The United States disbursed or guaranteed over $865 million in students loans for approximately 16,000 students that attended the InfiLaw Schools from 2010 through the third quarter of the 2014-2015 school year. The InfiLaw schools disbursed the majority of this money to themselves in the form of tuition revenue. The amounts paid on behalf of students at each of the InfiLaw Schools by year and federal program are set forth in **Exhibit A**.

**A.   InfiLaw's Business Model Relies upon Fraud and Deceit to Retain Its Title IV Eligibility**

To satisfy InfiLaw's profit goals, the InfiLaw Schools admitted as many students as possible, without regard as to whether those students could become practicing attorneys. This lack of meaningful admission standards required the InfiLaw Schools to engage in schemes to knowingly manipulate the Title IV revenue, bar passage and graduate placement data that the Schools were required to report in order to remain enrolled in the Title IV program.

ABA Standard 501 (b) states: "[a] law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar." Importantly, Interpretation 501-4 states:

> A law school may not permit financial considerations detrimentally to affect its admission and retention policies and their administration. A law school may face a conflict of interest whenever the exercise of sound judgment in the application of admission policies or academic standards and retention policies might reduce enrollment below the level necessary to support the program.

The InfiLaw Schools are all accredited by the ABA and accreditation is

20

required for the schools to be eligible to participate in the Title IV Programs. Many States also require that prospective lawyers graduate from ABA-accredited law schools before taking the state's bar exam or obtaining a license to practice law as an attorney of that state.

Admission to law school is typically selective in that there are more applications by prospective students than available seats and that students must display a level of academic skill that will allow them to complete the rigorous law school curriculum, pass a bar exam, and competently represent clients as practicing attorneys.

The InfiLaw Schools knowingly admit students that do not appear capable of satisfactorily completing its educational program and being admitted to the bar. The InfiLaw Schools, at the direction of InfiLaw, have allowed financial interests to detrimentally affect its admission, retention policies and law school administration.

Students admitted to ABA-accredited law schools must complete an assessment test prior to applying for admission that gauges the student's attitude for legal study and ability to provide competent legal services as an attorney. The test used by virtually every ABA-accredited law school is the Law School Admission Test or LSAT. Prospective law students that take the LSAT are given a score that ranges from 120 to 180 and scores from each test administration are curved to account for test-to-test variation in difficulty. The median LSAT score is between a 151 and 152, meaning that 50% of students scored 152 and above while approximately 50% score 151 or below. An LSAT score of 140 corresponds to the

13.4 percentile, meaning that only 13.4% of test takers scored 140 or below. An LSAT score of 135 corresponds to approximately the bottom 5% of all test takers.

LSAT scores are highly correlated with bar passage. At least one analysis concluded that students that score below 144 on the LSAT have less than a 25% chance of passing a bar exam on their first try.

The InfiLaw Schools knowingly recruit and admit students that do not have a reasonable chance of academic and professional success in the legal profession. For example, at Florida Coastal, the LSAT scores for the 75th, 50th, and 25th percentiles of students starting law school in 2014, were 147, 143, and 140, respectively. This means that 25% of Florida Coastal's starting class, 106 students, was in the bottom 13.7% of all LSAT takers. The median undergraduate GPA for Florida Coastal's 2014 starting class was 2.93.

In 2014, the InfiLaw Schools enrolled more than 283 students that did not score better than the bottom 13.7% of all LSAT takers and 25% of Charlotte Law's entering class were in the bottom 10% of LSAT scores. More than 50% of the 1,132 students that InfiLaw enrolled in 2014 had an undergraduate GPA of less than 2.94.

In comparison, looking at every medical school in the United States, only 5 applicants nationwide were accepted to *any* medical school with Medical College Admission Test (MCAT) scores in the bottom 13% percentile and an undergraduate GPA below a 3.0 for the academic years 2012-2014, *combined.* See https://www.aamc.org/download/ 321508/data/factstable24.pdf (aggregating

admissions data from accredited M.D. programs).

Overall, only 35% of InfiLaw's 2013 graduates found permanent full-time jobs that required a law license. To compound the lack of quality job prospects, the median federal student loan debts for graduates of the InfiLaw Schools was $184,792, $174,844, and $159,208 for Summit Law, Florida Coastal, and Charlotte Law, respectively. These amounts do not include private or undergraduate student loans.

InfiLaw and the InfiLaw Schools knew that admitting unqualified students would put their ABA accreditation and Title IV eligibility at risk due to low graduate employment and bar passage rates. Yet, instead of not admitting these students, which would decrease InfiLaw's revenue, the InfiLaw Schools, at the direction of InfiLaw, have instead opted to continue admitting unqualified students and engage in a widespread scheme to manipulate and conceal the negative data that would otherwise be generated by these unscrupulous practices. Without this manipulation, the InfiLaw Schools would not be able to maintain ABA accreditation and Title IV eligibility.

### B.    The InfiLaw "Trap"

The InfiLaw "System" has directed its schools to operate as a taxpayer-funded trap for unwitting students. The Dean of Summit Law has even referred to "building a better mousetrap" when addressing the faculty about ways to keep

23

students at the school.[1] This trap is baited with the demonstrably false representation that a legal education from the InfiLaw Schools, financed with hundreds of thousands of dollars in non-dischargeable student loan debt, is an economically-sound decision. This illusion is purposefully manufactured and maintained by various InfiLaw initiatives that are designed to deceive the next generation of potential students, as well as the ABA and ED.

First, the InfiLaw Schools spend a disproportionate amount of their students' tuition on marketing and recruitment efforts designed to solicit potential students. This includes employing admissions representatives that sell potential students on applying to the InfiLaw Schools and special admission programs designed to identify and admit students that would not be admitted to any other ABA-accredited law schools. One such marketing program is InfiLaw's Alternative Admissions Model Program for Legal Education (AAMPLE) Program. AAMPLE is a "conditional admit" program that is typically targeted at recruiting students who score poorly on the LSAT. AAMPLE's stated purpose is "to provide a path of admission to InfiLaw schools for individuals whose academic indicators (i.e., LSAT scores, GPAs), may not reflect their potential to succeed in law school." AAMPLE consists of a 6-7 week program of two classes, which is promoted as giving students an introduction to law school while providing an alternate mode of entry into the InfiLaw Schools for students with exceptionally low LSAT and GPA scores. The

---

[1] This idiom generally refers to improving upon a commonly-used device, but was used by Dean Shirley Mays to literally convey the intent of trapping students at Summit Law.

program costs $500 and can either be taken online or at the InfiLaw Schools' campuses. InfiLaw paid for the creation of a separate website, also known as a landing page, www.lawcareernow.com, as a means of recruiting students into the AAMPLE Program.

Second, from the outset, InfiLaw begins collecting data on its students with the goal of predicting which students are likely to fail the bar exam. This includes data generated by the AAMPLE Program, MBE Assessment tests administered by Kaplan, students' law school grades, LSAT scores, and data from the internal bar preparation courses administered by Barbri. This data is used by InfiLaw's statisticians to generate Excel spreadsheets that calculate the probability that a student will fail the bar exam. Students' sex and race are used as quantitative factors to identify students at risk of failing the bar in the statistical "models" employed by the InfiLaw Schools.

Third, InfiLaw attempts to keep the students enrolled in the InfiLaw Schools even after it becomes apparent that the students are unlikely to pass the bar or be able benefit from a legal education. Students that have less than a 2.5 law school GPA, or even students with less than a 2.0 GPA, are allowed to continue taking courses—even though the InfiLaw schools own internal grading systems indicate the students are poor-performing and likely to fail the bar. This insures that InfiLaw can continue collecting Title IV money for these students. At the same time, the InfiLaw Schools have implemented policies designed to undermine high performing students' attempts to transfer to better law schools.

Fourth, near the end of their legal educations, InfiLaw students are forced to enroll in InfiLaw's internal bar exam programs that are designed to further identify students that are at risk of failing the bar and to artificially and illegally manufacture non-Title IV 90/10 Revenue for the InfiLaw Schools.

Last, the schools actively try to prevent students at risk of failing the bar from taking a bar exam until those students no longer need to be reported as part of the schools' bar passage rates or will take a later exam that has a historically lower passage rate. These students are encouraged to participate in extended bar preparation programs that allow the InfiLaw Schools to falsely count the students as being "employed" in full-time positions on the InfiLaw Schools' job placement disclosures, which are required by the ABA and 34 C.F.R. § 668.

### C.   In-house Bar Preparation Courses

Barbri and Kaplan are the two largest bar exam test preparation providers in the United States. Both companies begin soliciting law students to sign up for their bar exam preparation courses during the first year of law school. Students that enroll in Barbri's or Kaplan's courses are required to pay a deposit in exchange for "locking in" the bar exam preparation course price. Law students that sign up earlier, i.e., during their first year, supposedly pay less in deposit than students that sign-up later. The deposit is typically between $99 and $500. However, students that wait to sign up can often obtain discounts or other incentives as Barbri and Kaplan compete to provide the students' bar review courses.

Barbri and Kaplan both hire student representatives to recruit other

26

students for their bar preparation courses. These representatives are often current law students and receive a free or discounted bar exam preparation course in exchange for recruiting students. The cost of a test preparation course varies significantly by state, but is often between $2000 and $4500 for the 6-8 week course.

Both Barbri's and Kaplan's bar preparation courses include a series of live or recorded lectures, study materials, and practice exams. A significant portion of the courses' cost is attributable to Barbri's and Kaplan's copyrighted bar preparation books, outlines, and practice exams, which are tailored to each state's bar exam.

Typically, if Barbri or Kaplan offers a bar preparation course in a particular state, they offer live or pre-recorded lectures in a physical classroom staffed by Barbri or Kaplan employees (the "live" courses). The live courses are offered at almost every ABA-accredited law school in the state or, if there are two law school in the same city, at least one live course in that city. Barbri and Kaplan offer bar exam preparation courses at every non-InfiLaw law school in Arizona, Florida, and North Carolina.

In 2011 or 2012, InfiLaw and the InfiLaw Schools approached Barbri and Kaplan about creating an internal bar exam preparation program that would be offered at the InfiLaw Schools.

The program, which was implemented at all three InfiLaw Schools, utilized the written materials and lectures developed by Barbri and Kaplan for their bar exam preparation courses.

The Summit Law internal bar preparation course is referred to as the Multi-

Year Bar Accelerated Review or "MyBar" program.

Florida Coastal's internal bar preparation course is called the Coastal Enhanced Bar Pass Program.

Charlotte Law's internal bar preparation course is call the Bar Exam Advanced Review or "BEAR" program.

In or around 2012, InfiLaw and the InfiLaw Schools entered into agreements with Barbri and Kaplan that provide that Barbri and Kaplan would stop offering their own courses at the InfiLaw Schools in exchange for the InfiLaw Schools' purchase of Barbri and Kaplan materials for their internal programs.

The only other in-house bar preparation program offered by a law school is a purely optional course offered by the University of Missouri in Kansas City (UMKC). The UMKC program was actually developed by the law school, as opposed to simply relabeling Barbri and Kaplan's materials, and only costs $600. Students at UMKC are allowed to take Barbri and Kaplan bar preparation courses, and neither Barbri nor Kaplan was excluded from UMKC's campus in order to prevent students from signing up for those competing courses.

The agreements between InfiLaw and Barbri and Kaplan prohibit Barbri and Kaplan from soliciting the InfiLaw Schools' students, setting up recruiting tables at the InfiLaw Schools, or offering discounts to InfiLaw students.

The student representatives at Summit Law (and the other InfiLaw Schools), with whom Barbri and Kaplan had entered into agreements to recruit other students in exchange for a free bar preparations courses, were converted into

28

InfiLaw internal bar review student representatives.

Attempting to sign up for a "live" Barbri or Kaplan bar preparation course through their websites directs students to Barbri or Kaplan employees that, by agreement with InfiLaw, direct the students back to the InfiLaw Schools' internal bar preparation courses. For example, on the Barbri website, students from the InfiLaw Schools who are attempting to inquire about a bar preparation course are told to contact Karen Hundley, who is actually a Vice President at Barbri. Ms. Hundley is not a Barbri representative for any other law schools and instead redirects the students back to the InfiLaw internal bar review programs. InfiLaw's agreements with Barbri and Kaplan illegally fixed the price of the "live" bar preparation courses offered to Summit Law students, eliminated competition from Barbri and Kaplan, and resulted in large payments from InfiLaw to Barbri and Kaplan to ensure that the InfiLaw Schools' in-house bar review courses were the only option available to the InfiLaw students.

As another example, there was a student that graduated from Summit Law and then enrolled in a master's program at the Sorbonne in Paris, France. After completing the master's program, the student attempted to take a bar review course provided by BarBri to prepare for the New York bar exam. BarBri informed the individual that the only way the student could take BarBri's preparation course was to enroll in Summit Law's internal bar preparation course in Phoenix, Arizona.

Although the InfiLaw Schools' bar preparation courses were touted as an honest attempt to increase the InfiLaw Schools' bar passage rates and as an

29

"individualized bar preparation program designed specifically for [Summit Law students]" that "comprises the best features of Barbri and Kaplan," one of the primary reasons that InfiLaw created the program was to inflate the portion of revenue at the InfiLaw Schools that could be counted as non-Title IV or "10" revenue. Prior to the creation of the MyBar program, the InfiLaw Schools, and in particular Summit Law, were in danger of violating the 90/10 Rule because the vast majority of their revenue was paid from Title IV sources.

For 2010-2012, the InfiLaw Schools were all within 5 percentage points of violating the 90/10 rule. As an example, for the 2010-2011 academic year, Summit Law reported receiving 87.94 percent of its qualifying revenue from Title IV sources.

The falsely reported 90/10 Rule data, which the InfiLaw Schools submitted at the end of each year to the ED, and which the ED is required by statute to report to Congress, is set forth in **Exhibit B** hereto. The InfiLaw Schools began reporting false 90/10 Rule data at least by 2012, when the internal bar preparation course was first launched.

Another primary reason for the development of its internal bar review programs is so that InfiLaw could gather data on and identify students that were unlikely to pass the bar exam. The goal of identifying students who were at high risk of failing the bar exam was to persuade the students to delay or forgo the bar exam and, thereby, falsely inflate the InfiLaw Schools' bar passage and employment rates as set forth in greater detail below.

Barbri and Kaplan entered into agreements with InfiLaw in connection with

the InfiLaw Schools' internal bar exam programs knowing full well that one of the purposes of the program was to inflate and falsify the Schools' non-Title IV revenue to avoid having the schools become automatically ineligible for Title IV funding.

In order to immediately begin recognizing the money paid by the InfiLaw Schools' students as non-Title IV revenue, the InfiLaw and the InfiLaw Schools, with assistance from Barbri and Kaplan, concocted a plan to make the students who had already paid deposits or tuition to Barbri or Kaplan switch their enrollment to the InfiLaw bar preparation programs for the July 2012 through July 2013 bar exams. InfiLaw required students to make payments to the InfiLaw schools instead of Barbri or Kaplan, and improperly counted this income as non-Title IV income in their 90/10 calculations for 2012 through the present.

The purpose of the internal bar review programs was to knowingly misstate the InfiLaw Schools' 90/10 revenue calculation. For example, on September 15, 2011, the Dean of Summit Law (then called the Phoenix School of Law) informed the Director of Academic Services at Summit Law that Defendant InfiLaw had "tasked" Summit Law with "operating our own bar prep course as a real solution for 90/10." The Dean further described "this important initiative for our 90/10" as a "top, top priority for both the school and the consortium." The Dean also insisted that this "90/10 program" begin in December 2011 for those taking the February 2012 bar exam. After the Summit Law Director of Academic Services raised ethical objections to forcing students to use an internal bar preparation course, Summit Law terminated the Director's employment.

The $2500 each student paid to Summit Law for the MyBar course was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona. On information and belief, the same materials used for the internal bar preparation courses at the other InfiLaw Schools were merely Barbri and Kaplan materials used at other law schools in those states that had been relabeled for InfiLaw's internal review program.

In addition to the anti-competitive and sham nature of the internal bar preparation course revenue, the entire amount of the internal bar preparation course fees paid to the InfiLaw Schools was really for "books and materials" provided by Barbri and/or Kaplan. As a result, the InfiLaw Schools were prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges. 34 C.F.R. § 668.28(a)(7)(v).

InfiLaw and the InfiLaw Schools' arrangements with Barbri and Kaplan included agreements that prohibit Barbri and Kaplan from engaging in the recruitment activities that Barbri and Kaplan engage in on other law school campuses. This includes prohibitions against hosting informational sessions or setting up recruitment "tables" on campus, sending emails to students regarding Barbri and Kaplan's bar preparation programs, offering tuition assistance and discounts to students or otherwise competing with InfiLaw in pricing or advertising to InfiLaw Students for bar preparation courses.

InfiLaw, the InfiLaw Schools, Barbri and Kaplan conspired to manipulate

32

and falsify the InfiLaw Schools' 90/10 Rule data by entering into an illegal price fixing and anti-competitive arrangement that limited students' ability to choose between multiple competing live bar preparation programs, as well as eliminating discounts and other incentives that would typically be offered to students by Barbri and Kaplan. Specifically, the InfiLaw Schools' non-Title IV revenue was inflated by approximately $2500 for each graduate that took the internal bar preparation program.

By requiring its graduates to take the InfiLaw Schools' internal bar review course and actively preventing the students from purchasing other bar preparation courses, the InfiLaw Schools reported false information to the ED and prospective students regarding the InfiLaw Schools' institutional charges. A Policy Bulletin issued by the ED on January 7, 1999, states that all tuition, fees, room and board, and other charges an institution assesses a student are institutional costs, unless demonstrated otherwise. Specifically, the ED guidance states that

> expenses for required course materials are institutional costs, if the student does not have a real and reasonable opportunity to purchase the required course materials from any place but the institution he or she is attending.
>
> * * *
>
> If an institution wishes to classify the cost of required course materials as non-institutional costs, it must be able to substantiate that: 1) the required course materials were available for purchase at a relatively convenient location unaffiliated with the school; and 2) the institution made financial aid funds available to students in a timely manner, so its students could exercise the option to purchase the required course materials from alternative sources.

33

Fraudulently omitting the cost of the internal bar preparation courses from the InfiLaw Schools' institutional charges resulted in inaccurate information being submitted on every single student's Title IV student aid application. This adversely affected students that were forced to take out private loans to complete the internal bar preparation courses, and misstated the cost of attending the InfiLaw Schools.

### D.     Extended Bar Review Program

In 2013, InfiLaw and the InfiLaw Schools developed an extended bar preparation course that was designed to delay the bar exam for students that were identified as being at high risk for failing the bar. The InfiLaw Schools named this program the Unlock Potential or "UP" Program.

The UP Program, which is provided in addition to the schools' internal bar preparation course, is an extended, 6-month bar preparation program. During the six-month UP Program, students are paid a monthly stipend of $1200 for living expenses and placed in a part-time (20 hours per week), short-term, low-pay job. Both the stipend and hourly pay are funded by the InfiLaw Schools.

Even though the UP Program paid a stipend to the students, the InfiLaw Schools still required students to pay the $2500 bar review preparation course fee so that the schools could falsely include the fee as non-Title IV revenue while also counting the UP Program stipend as institutional aid in their 90/10 calculation.

Beginning in the first year of law school, the InfiLaw Schools begin gathering extensive data on students' academic performance. Specifically, InfiLaw began administering Multi-State Bar Exam (MBE) questions to students as part of

assessments that begin in the students' first year of law school. The InfiLaw Schools use the data collected on their students, including the students' undergraduate GPA, LSAT score and law school GPA to calculate the probability that a given student will fail the bar exam.

Based on the data collected on the law students, the InfiLaw Schools then identify and recruit students that are considered likely to fail the bar exam for the UP Program.

Although technically any InfiLaw student could apply for the UP Program, only those that are identified as being at high risk for failing the bar or were at risk of being counted as unemployed were actually accepted into the UP Program.

The UP Program was intentionally designed to, and has, artificially inflated the employment statistics reported by the InfiLaw Schools to the ABA, ED, and prospective students.

For example, Summit Law identified targeted and enrolled students at high risk of bar failure to delay the July 2014 bar exam through participation in the UP Program. These students did not sit for a bar exam in 2014, which artificially inflated Summit Law's first-time taker bar passage rate for 2014.

Another purpose of the UP Program is to identify students that are unlikely to pass the bar and incentivize them to delay taking a bar exam or dissuade them from ever taking the bar exam. In either case, the InfiLaw Schools have manipulated and falsified their bar passage data, which is used by the ABA in evaluating whether to continue accrediting the law schools.

35

The InfiLaw Schools knowingly misreported the employment status of the students participating in the UP Program. Specifically, the InfiLaw Schools, at the direction of InfiLaw, mischaracterized the UP Program participants as being employed in full-time "bar passage required" or "J.D. Advantage" positions. This characterization of the UP Program participants' employment status is false because the InfiLaw-funded positions provided to the students during the UP Program were part-time (less than 35 hours per week) and short-term (less than 1 year). Furthermore, it is false and misleading to count students whose primary "job" is to continue studying for the bar as "employed." Last, the part-time (20 hours per week) positions that were provided to students in the UP Program did not meet the ABA definitions of "bar passage required" or "J.D. Advantage" positions.

For example, for its 2013 and 2014 ABA employment reports, Summit Law listed 7 (6 "bar passage required" and 1 "J.D. advantage" position) graduates as employed in full-time, long-term positions funded by the law school and 26 (25 "J.D. advantage" and 1 "bar passage required" positions) graduates employed in full-time, short-term positions. Summit Law reported no graduates as having part-time positions funded by the law school, which is the most generous characterization of the UP Program participants allowed by the ABA regulations. The UP Program participants were falsely classified as having full-time, long-term positions.

Florida Coastal listed zero graduates employed in part-time positions funded by the law school in its 2013 and 2014 ABA disclosures. The UP Program participants were falsely classified in other categories.

Charlotte Law listed zero graduates employed in part-time positions funded by the law school in its 2014 ABA disclosure. The UP Program participants were falsely classified in other categories.

**E.      Summit Law Falsely Reported Its Bar Passage Numbers to the ABA**

ABA Standard 301 for the 2013-2014 ABA Standards and Rules of Procedures (now ABA Standard 316) requires that accredited law schools prepare students for admission to the bar. Interpretation 301-6 states that a school may satisfy Standard 301 by either (1) having 75% of its graduates from the last five years pass the bar exam that year, (2) in at least 3 of the last 5 years, having 75 percent of the students graduating in those years and sitting for a bar exam pass the exam, or (3) in 3 of the last 5 years, having a first-time bar passage rate that is no more than 15 percentage points below the average first-time passage rates for graduates of ABA-approved schools taking the exam in the same jurisdiction. For options 1 and 2, the school must report bar passage results for as many jurisdictions as necessary to account for at least 70% of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency. For option 3, the school must report first-time bar passage data

> from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, *starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency*. When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to

determine compliance.

ABA Standards and Rules of Procedure for Approval of Law Schools 2013-2014, Interpretation 301-6, available at http://www.americanbar.org/content/dam/aba/ publications/misc/legal_education/Standards/2013_2014_standards_chapter3.authc heckdam.pdf (emphasis added).

Similarly, Appendix 3: Guidance on Interpretation 301-6 from the ABA reiterates that:

> The school must account for a minimum of 70% of first-time takers in each of the five most recently completed calendar years. It does this by starting with the jurisdiction in which the largest number of its graduates sit for the bar for the first time and *proceeding in descending order of frequency* until a minimum of 70% of first-time takers in each calendar year is accounted for.

*Id.*, available at http://www.americanbar.org/content/dam/aba/publications/ misc/legal_education/Standards/2013_2014_standards_appendix3_301_6.authcheck dam.pdf (emphasis added).

For its 2014 ABA Standard 509 report, Summit Law reported that it had 299 first-time bar takers, and disclosed its average school pass rate as 69.09% for a sample comprised of 73.58% these students. This rate included graduates taking the February and July 2013 bar exam in Arizona (207 takers), Texas (5), Washington (5), New Mexico (2) and Wisconsin (1). This rate was reported as 9.54% below other first time takers from ABA-accredited law schools in those states.

Summit Law knowingly misreported its bar passage data for the February and July 2013 bar exams by failing to include bar passage data from California. For the February and July 2013 California bar exams, 12 of 27 (44.4%) first-time takers and 1 of 11 (9.1%) repeat takers from Summit Law passed the California bar exam. The overall passage rate on the 2013 California bar exams for first-time takers from

ABA-accredited law schools was 71.09%. Had Summit Law followed the methodology required by the ABA and included California as the jurisdiction with the next largest population of bar exam takers, it would have reported a first-time taker bar passage rate of 67.09% and that its students passed at a rate 10.31% less than first-time takers from other ABA-accredited schools.

For the February and July 2014 California bar exams, there were 23 first time takers from Summit Law. None of these students passed the bar. For the February and July 2014 Arizona bar, Summit Law had 131 of 239 or 54.8% of first-time takers pass the exam compared with a 73.8% passage rate for all ABA accredited first-time takers. These dismal bar passage rates, which fall below ABA requirements and threaten the schools' accreditation, indicate why Summit Law and the other InfiLaw Schools have resorted to manipulating their bar passage rates.

## F.    Bar Passage Assurance Programs

In addition to the mandatory internal bar preparation courses and UP Program, InfiLaw and the InfiLaw Schools offer a "bar passage assurance" program that provides students with a $10,000 payment if they complete both the internal bar preparation course, UP Program, and still fail the bar twice.

The conditions for the $10,000 Bar Passage Assurance—i.e., failing the bar twice, completing the internal bar preparation course, and completing the UP Program—are activities that occur after students graduate (and are no longer enrolled) in the InfiLaw Schools. The internal bar preparation course and UP

Programs are not licensed by the InfiLaw Schools' states as higher education programs. As a result, it is contrary to the Title IV regulations and ED guidance to count the Bar Passage Assurance payment as institutional aid or fail to deduct the UP Program payments or Bar Passage Assurance payments as refunds for the internal bar preparation course fee.

### G.   The Combined Effect on InfiLaw's 90/10 Rule Calculation

InfiLaw and the InfiLaw Schools created and implemented the internal bar preparation course and UP program with the express goal of materially falsifying the Schools' 90/10 Rule calculation. The effect on the 90/10 Rule data was magnified, without impacting InfiLaw's profits, because the Schools reduced the "90" (Title IV revenue) by amounts it paid to students through the UP and Bar Passage Assurance Programs while also inflating the "10" (non-Title IV revenue) by the amounts it collected for the internal bar review courses and AAMPLE Programs. This manipulation was material in that the InfiLaw Schools would have been ineligible to receive Title IV funding had the government known about the intentional falsification of the 90/10 Rule data each school is required to provide annually to the ED.

### COUNT I:   PRESENTMENT OF CLAIMS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(A))

Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States Government false or fraudulent claims.

Such claims were false or fraudulent because the Defendants falsely submitted, or caused to be submitted, claims for Title IV funding that were not eligible for payment under the federal regulations governing the Title IV Programs. The United States, unaware of the falsity of the claims made by the Defendants, paid Defendants for claims that would otherwise not have been allowed.

By knowingly failing to comply with requirements upon which payment was contingent, each claim presented or caused to be presented by Defendants was false. As a result of these false claims, the United States paid over $533 million in federal student aid funding during the 2012-2013, 2013-2014, and 2014-2015 school years.

By knowingly, willfully or recklessly presenting, or causing other to present, false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT II: <u>FALSE STATEMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(B))</u>

2.     Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

By virtue of the acts described above, Defendant made, used, and caused to be made and used, false records and statements that were material and caused or contributed to improper payments of federal funding to Defendants. Specifically, Defendants knowingly expressly and impliedly made false statements and certifications to the ABA, ED, and prospective students that were material to the InfiLaw Schools' Title IV eligibility, which is a condition of payment for the Title IV aid disbursed to the students attending the InfiLaw Schools.

The United States, unaware of the falsity of the records, statements, and certifications paid for claims that would otherwise not have been allowed.

By knowingly, willfully or recklessly making, or causing others to make, false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

### COUNT III: RETENTION OF OVERPAYMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(G))

Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

By virtue of the acts described above, Defendants have knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. Specifically, Defendants knew or should have known that they received millions of dollars in payments from TRICARE for claims that were prohibited by the Anti-Kickback Statute.

Once known, even if the improper payments were not fixed or clearly defined, Defendants had an obligation to remit or report such funds to the government within sixty (60) days. Defendants have not reported or returned the improper payments described herein.

By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America, by causing the United States to be deprived of funds that rightfully belong to the government.

As a direct and proximate result of Defendants' fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Defendants.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five-thousand five-hundred to eleven-thousand dollars ($5,500 - $11,000).

### COUNT IV: CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
### (31 U.S.C. § 3729 (a)(1)(C))

Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(C), as amended.

By virtue of the acts described above, Defendants have knowingly conspired to violate 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

Specifically, InfiLaw and the InfiLaw Schools entered into agreements with Barbri and Kaplan to manipulate and misstate the InfiLaw Schools' 90/10 Revenue and bar passage rates. Barbri and Kaplan entered into these agreements knowing that the purpose and effect of the agreements was to manipulate the 90/10 Rule data to retain Title IV eligibility in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

Defendants knowingly, recklessly, or with deliberate indifference agreed to perpetuate a fraudulent scheme to obtain and retain ineligible Title IV funding in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

The United States paid claims that would otherwise not have been allowed as a result of the actions taken by Defendants in furtherance of a conspiracy to violate

31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

Defendants are jointly and severally liable for every violation of the False Claims Act identified herein because these violations were committed in furtherance of a scheme to violate the False Claims Act, which was undertaken with the mutual agreement of each Defendant and knowledge of, or reckless indifference toward, the scheme's illegality.

Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500-$11,000).

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

b.    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.    Relators are awarded the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

d.    Relators are awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e.    Defendants are enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.    Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

g.    The United States and Relators recover such other relief as the Court deems just and proper.

47

## JURY DEMAND

A trial by jury is hereby demanded.

Dated: November 18, 2015

By: _____

JESSE L. HOYER
FL Bar No.: 076934
jlhoyer@jameshoyer.com
ELAINE STROMGREN
FL Bar No.: 0417610
estromgren@jameshoyer.com
JAMES HOYER, P.A.
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2589
Phone: (813) 397-2300
Fax: (813) 397-2310


LEVY KONIGSBERG LLP
Alan J. Konigsberg
akonigsberg@levylaw.com
Brendan E. Little
blittle@levylaw.com
(seeking admission *pro hac vice*)
800 Third Ave., 11th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

*Attorneys for the Relators*